**NATIONAL FEDERATION
OF THE BLIND, INC.**

v.

**LOOMPANICS ENTERPRISES,
INC., d/b/a Loompanics
Unlimited, et al.**

Civil Action No. CCB 95–2633.

United States District Court,
D. Maryland.

Aug. 20, 1996.

Daniel F. Goldstein, Brown, Goldstein & Levy, Baltimore, MD, for Plaintiff.

Cynthia L. Leppert, Baltimore, MD, for Defendant.

### *MEMORANDUM OPINION*

BLAKE, District Judge.

On October 23, 1995, the plaintiff, the National Federation of the Blind ("NFB"), filed a fourteen-count amended complaint against Loompanics Enterprises, Inc. ("Loompanics") and Bruce Evans a/k/a/ Bruce Easley ("Evans"). The amended complaint seeks damages and equitable relief for a variety of alleged violations of the trademark and copyright laws. These claims arise out of a book, written by Evans and published by Loompanics, which reproduces three of the NFB's registered marks. After filing a counterclaim seeking to cancel the NFB's trademark registration and a cross-claim seeking indemnification or contribution from Evans, Loompanics filed a motion to dismiss, or, in the alternative, for summary judgment on the trademark claims, Counts one through twelve of the NFB's amended complaint. No motions have been filed with respect to the

two copyright claims. For the reasons that follow, Loompanics's motion will be **GRANTED** in part, and **DENIED** in part.

## I.

The NFB was organized in 1940 as a charitable organization devoted to educating the public on matters relating to the social and economic welfare of the blind. In 1949, the NFB was incorporated under the laws of the District of Columbia. Currently, its principal place of business is in Baltimore, Maryland. It is the oldest and largest organization of blind persons in the United States, with affiliates in all fifty states. Loompanics is a Washington State corporation engaged in the publishing and distribution of books. Evans, the author of the book, was a Washington State resident, however his current residence is unknown. He failed to answer the NFB's complaint, and, consequently, on April 24, 1996, this court entered an order of default against Evans in favor of the NFB for want of an answer or other defense.

The NFB's allegations of trademark and copyright violations arise out of Evans's book, *Biz-op: How to Get Rich with "Business Opportunity" Frauds and Scams* ("the book" or "*Biz-op*"). The book contains several references to the NFB and includes reproductions of its emblem in the context of the author's descriptions of a variety of fraudulent schemes. One of the schemes in the book involves a method of defrauding individuals through sham charity vendor arrangements. Under this "charity system," a person advertises bogus charity vendor positions in the newspaper while posing as a representative of a charity. Those responding to the ad are told they can make significant sums of money with little investment by agreeing to collect change from "honor boxes," counter top vending machines, and a charity game called "Jackpot." The perpetrator of the fraud tells the person seeking the position the charities require only that the vendor sign a contract with them, and that the vendor send the charity two dollars each month.[1] The book states the charities "are happy" if the vendor merely executes the contract and pays the monthly fees. According to the book, the vendor will make insignificant amounts of money for the efforts expended, despite the promises of large weekly returns. However, the book promises the perpetrator of the fraud may net over $4,500 by charging the vendor a fee for the money-collecting devices and also a locator fee for having identified businesses willing to house the devices. To complete the scheme, the book describes inexpensive ways for the perpetrator of the fraud to make authentic-looking devices which appear to be provided by the charity.

The NFB is mentioned several times in connection with these schemes. In the book, Evans asserts he uses the NFB's name in connection with ninety percent of the frauds he perpetrates. He describes using the NFB's name when he is attempting to convince a store manager to allow a temporary installation of the contribution collection devices, and he also discusses the placement of the NFB's name and emblem on the devices themselves. A copy of an authentic NFB vendor contract and a Location Acquisition Agreement, ("LAA") both of which include the NFB emblem, are included in the appendix to the book. The LAA is a simple consent form to be filled out and signed by a responsible person at the premises where the contribution collection device is placed. In addition to the terms of the agreement, the LAA bears the emblem of the NFB and the designation: "Vending Outreach Program."

■ The NFB has registered three marks relevant to this lawsuit. On January 10, 1978, it registered its trademark[2] "National Federation of the Blind" with the United States Patent Office. On January 5, 1982, the NFB registered its emblem as a trade-

---

1. The book refers to the person seeking the charity vendor position as "the mooch."

2. Throughout this opinion the word "trademark" or simply "mark" will be used to denote all three of the NFB's registered marks. This is in accord with common trademark usage; the term "trade-

mark" is used to denote "the name of a product, service, or business enterprise that may be appropriated to the use of one party under the common law or the Lanham Act." *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1040 n. 11 (D.C.Cir.1989).

mark. The emblem is a circle, overlain by a triangle containing the letters "NFB," and encircled by the words "Security," "Equality," and "Opportunity." Finally, on July 7, 1992, the NFB registered another mark, "Vending Outreach Program," a term used to identify certain fund-raising services.

The NFB alleges Loompanics is liable for trademark violations associated with each of their three marks. The service mark "National Federation of the Blind" is the subject of Counts one through four. The trademark emblem is the subject of Counts five through eight and the service mark "Vending Outreach Program" is the subject of Counts nine through twelve. For each mark, the NFB has alleged four theories of recovery. Counts one, five, and nine allege violations of § 32 of the Trademark Act of 1946 ("the Lanham Act" or "the Act").[3] See 15 U.S.C. § 1114(1). Counts two, six, and ten allege unfair competition and false designation of origin under § 43(a) of the Act. See 15 U.S.C. § 1125(a). Counts three, seven, and eleven allege a claim of tarnishment of trademark, however the NFB does not indicate under which State's law it is suing. Finally, Counts four, eight, and twelve allege trademark infringement under Maryland common law.

Loompanics has moved for summary judgment or dismissal of all of the NFB's trademark claims. It first argues generally its use of NFB's marks is a "fair use" which is not actionable under the trademark laws. The fair use argument takes two somewhat different forms. First, Loompanics cites a statutory fair use defense under the Lanham Act. See 15 U.S.C. § 1115(b)(4). Second, it argues it's use is "merely descriptive" of the NFB and its services, and therefore, the use is outside the scope of the trademark laws. Although it is not explicit on this point,

Loompanics apparently intends its fair use defense to apply to the NFB's Lanham Act and Maryland common law infringement claims. It states, by reason of its fair use alone, "none of the trademark claims state a claim upon which relief can be granted."[4] Second, Loompanics has asserted two defenses to a claim the NFB raised with specificity for the first time in its opposition. Without any reference to the theory in its complaint, the NFB now argues Loompanics is liable for contributory trademark infringement. With respect to this claim, Loompanics argues first the NFB has not brought an action for contributory infringement because this theory was not presented in the amended complaint, and second, it argues the NFB has failed to allege the essential elements of this cause of action. Third, Loompanics challenges the validity of the NFB's marks. Loompanics argues the marks "National Federation of the Blind" and "Vending Outreach Program" are generic terms and are not entitled to trademark protection. Finally, Loompanics maintains it is entitled to dismissal on the tarnishment counts because neither Maryland nor federal law recognize a cause of action under that theory and the NFB has not indicated under what body of law it intends to bring this claim.

## II.

Because the NFB's trademark claims are somewhat novel, it may be helpful to lay out its theories for recovery and the authority supporting those theories in some detail. I will evaluate Loompanics's defenses in the context of these claims.

## A.

The NFB makes three arguments in support of its infringement claims under the Lanham Act and Maryland common law.

---

3. The Lanham Act is codified at 15 U.S.C. § 1051 et seq.

4. Counts four, eight, and twelve allege trademark infringement under Maryland common law. In almost all cases the state law of trademark infringement and unfair competition tracks the federal Lanham Act and the same result obtains under both bodies of law. See Perini Corp. v. Perini Const., Inc., 715 F.Supp. 719, 721 (D.Md. 1989) ("[T]he same legal standard applies to all of the plaintiff's claims" under the Lanham Act and Maryland, Virginia, West Virginia, and Pennsylvania common law.), rev'd on other grounds, 915 F.2d 121 (4th Cir.1990). In light of this principle and the parties' failure to allege Maryland trademark law differs in any relevant respect from the Lanham Act, Counts four, eight, and twelve will survive or fall with their federal counterparts, Counts one, five, and nine.

First, it argues a reasonable person reading the book would believe " 'sponsorship, association, affiliation, connection or endorsement' exists between" the NFB and Loompanics. NFB's Mem. in Opp. at 6 (quoting *Quality Inns Intern., Inc. v. McDonald's Corp.,* 695 F.Supp. 198, 209 (D.Md.1988). The second argument urged by the NFB is that potential contributors, who are aware of the book, might confuse the legitimate fund raising activities of the NFB with the fraudulent schemes in the book. At the heart of the first argument is the notion that the NFB agreed to the use of the marks in the book and at least condones, if not endorses the use of the marks in this manner. The second argument does not rely on any implied assent by the NFB, but instead suggests those who are aware of the contents of the book and who would otherwise contribute to the NFB, will no longer contribute because they will have no way of knowing whether their contribution will be used for a legitimate or fraudulent purpose. As noted above, the NFB's third theory of liability, contributory infringement, was raised in its opposition to Loompanics' dispositive motion. Under its contributory infringement theory, the NFB argues Loompanics is liable for infringement because the book allegedly encourages readers to use the NFB's marks in fraudulent activities.

In support of its Lanham Act infringement claim, the NFB uses the following virtually identical language in Counts one, five and nine of its amended complaint:

> The use [of the NFB's marks by Loompanics] constitutes trademark infringement, as it causes a likelihood of confusion, mistake or deception as [to] the affiliation, connection or association of defendants with the NFB, or as to origin, sponsorship or approval of Defendants' goods or commercial activities by Defendants.

The NFB cites § 1114(1) of the Lanham Act as authority for these Counts. While the NFB does not state which subsection of § 1114(1) it believes Loompanics has violated, it appears as though it intended § 1114(1)(a) be the basis for recovery. The statute provides, in relevant part:

> Any person who shall, without the consent of the registrant-use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1)(a).

In Counts two, six, and ten of the amended complaint, the NFB also alleges "unfair competition and false designation of origin" under § 1125(a) of the Lanham Act. In these Counts the NFB alleges Loompanics's use of the marks amounts to

> unfair competition, a false designation of origin and a false and misleading representation of fact which is likely to cause confusion, mistake and deception as to the connection or association of the Plaintiff with charity products, programs, contracts, agreements, scams and artifices contained in the book.

The complaint further alleges Loompanics's use of the marks in the book was an attempt to "deceive the public into mistaking and confusing the NFB as having originated, sponsored or approved of the [fraudulent activities described] in the book." The NFB cites § 1125(a) of the Lanham Act as authority in support of this claim. The statute reads, in relevant part:

> (1) Any person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).

Finally, the NFB argues Loompanics is liable for contributory infringement of its marks. In support of this claim, the NFB cites two Supreme Court cases discussing a cause of action for contributory infringement. The more recent of these cases suggested, without clearly holding, a cause of action for contributory infringement arises from § 1114 of the Lanham Act, the section establishing liability for direct infringement. *See Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 856, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982).

### III.

The standards for summary judgment and dismissal for failure to state a claim are familiar. Rule 56(c) of the Federal Rules of Civil Procedure provides:

> [Summary judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified this does not mean any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). The only facts properly considered "material" are those that might affect the outcome of the case under the governing law. *Id.* at 249–50, 106 S.Ct. at 2511. If the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* To determine

whether a genuine issue of material fact exists, all facts and all reasonable inferences drawn therefrom are construed in favor of the non-moving party. However, the non-moving party may not rest on its pleadings, but must show specific, material facts exist to create a genuine, triable issue. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Hinkle v. City of Clarksburg,* 81 F.3d 416, 421 (4th Cir.1996).

Federal Rule of Civil Procedure 12(b)(6) authorizes the dismissal of a complaint for failure to state a claim upon which relief can be granted. The purpose of this rule is to test the legal sufficiency of the claim. On a motion to dismiss, the court must view the allegations in the complaint in the light most favorable to the pleader. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Specifically, the court must accept the allegations contained in the complaint as true, and must liberally construe the complaint as a whole. *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969); *Finlator v. Powers,* 902 F.2d 1158, 1160 (4th Cir.1990). A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Faulkner Advertising Assoc. v. Nissan Motor Corp,* 905 F.2d 769, 771–72 (4th Cir.1990).

In support of its "fair use" defense, Loompanics argues it is entitled to the Lanham Act's statutory "fair use" defense to its reproduction of the plaintiff's marks, and, in the alternative, its use of the NFB's marks will not confuse consumers into believing the book either was issued by the NFB, or that the NFB endorsed or sponsored the book, or that Loompanics was somehow affiliated with the NFB. I address these arguments in turn.

### A.

In connection with its statutory argument, Loompanics cites paragraph 1115(b)(4) of the Lanham Act. This paragraph creates a defense to a charge of infringement where

"the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, ... of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin." 15 U.S.C. § 1115(b)(4). Although courts have differed on the exact formulation, it is generally held the defendant must establish three elements to prevail on the § 1115(b)(4) "fair use" defense: (1) its use of the registered term or device is "otherwise than as a [trade or service] mark," (2) the term or device is used "fairly and in good faith" and (3) the defendant is using the term or device "only to describe" those goods or services. *See Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 951 (7th Cir.1992), *cert. denied*, 507 U.S. 1042, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993); *Dayton Progress Corp. v. Lane Punch Corp.*, 917 F.2d 836, 840 (4th Cir.1990).

■■■ By both its purpose and its terms this defense is not available to Loompanics. The purpose of the fair use defense is to ensure descriptive terms that are protected in a registered mark not be absolutely withdrawn from the lexicon of commerce. The scope of the protection afforded by § 1115(b)(4), however, extends only to the use of a term by the alleged infringer to describe *its own* products or services. The term "party" in § 1115(b)(4) is most plausibly read to refer only to the alleged infringer. The first use of the term "party" § 1115(b)(4) is in reference to one who is afforded a defense to an infringement action for using their "individual name" in the name of their business. Given the context, the term "party" here could only refer to the alleged infringer. The part of § 1115(b)(4) relevant here provides one may use an otherwise registered term to describe, in good faith, "the goods and services of such party." The most natural reading of the term "such party" refers back to the sense in which the term "party" previously had been used in § 1115(b)(4). This is not to say this paragraph only provides a defense to a party seeking to use their own name in their business, but rather the term "party" is used only to refer to the alleged infringer. Because Loompanics is arguing the NFB's

marks are used in the book to only refer *to the NFB itself* and its services, § 1115(b)(4) does not provide a defense to this use.

The two cases upon which Loompanics primarily relies are not to the contrary. While it is true both cases involve a Lanham Act defendant's use of the plaintiff's mark to describe the plaintiff's services, neither court clearly rested its holding on § 1115(b)(4). In *WCVB–TV v. Boston Athletic Ass'n*, 926 F.2d 42 (1st Cir.1991), the Boston Athletic Association ("BAA") sued WCVB–TV, a local television station, under the Lanham Act to enjoin its televising the Boston Marathon. The BAA argued WCVB, by displaying the term "Boston Marathon" while broadcasting the event, violated federal trademark law because viewers would believe the BAA had endorsed WCVB's broadcast of the event. The BAA maintained this type of misperception amounted to consumer confusion within the meaning of §§ 1114(1) and 1125(a). Writing for the court, then-Judge Breyer did briefly discuss § 1115(b)(4), however this provision was not the basis for the court's holding that the BAA was not entitled to an injunction under the Lanham Act. Instead, the court appeared to rely on the failure of the BAA to show there was a likelihood viewers would be confused about WCVB's status as "official" or "authorized" broadcaster of the race. *See id.* at 44 ("The dispositive legal issue concerns 'customer confusion.'"); *id.* at 46 (concluding "we do not see how [WCVB's] broadcast could likely confuse viewers that it bore the imprimatur of the BAA").

Similarly, in *New Kids on the Block v. News America Publishing, Inc.*, 971 F.2d 302 (9th Cir.1992), the court rejected a Lanham Act challenge to the use of the plaintiff's trademark in connection with two newspaper polls. Acknowledging the case did not directly implicate the § 1115(b)(4) defense, the *New Kids* court stated "[t]o be sure, this is not the classic fair use case where the defendant has used the plaintiff's mark to describe the defendant's *own* product." *Id.* at 308. However, like the *WCVB–TV* court, the *New Kids* court discussed § 1115(b)(4) in holding that the defendants' use of the plaintiff's mark was not infringement under the Lan-

ham Act. Although the opinion is not clear on this point, the court did not appear to rely on the § 1115(b)(4) defense in rejecting the plaintiff's claim. Rather, it stated "[c]ases like these are best understood as involving a non-trademark use of a mark—a use to which the infringement laws simply do not apply." *Id.* at 307. Without citation to a specific provision of the statute, the court concluded the case fell into a "nominative use" category of cases which "lie[ ] outside the strictures of trademark law." *Id.* at 308. The court then laid out a three-part test for determining whether a use will qualify for the non-statutory "nominative fair use defense." [5]

Because the text of the statute and the cases do not support Loompanics's argument, it is not entitled to the benefit of the fair use defense afforded by § 1115(b)(4). It still may prevail, however, if its can demonstrate its use of the NFB's marks fall outside of the prohibitions of the Lanham Act.

## B.

█ In addition to the § 1115(b)(4) defense, Loompanics argues its use of the NFB's marks is a "fair use" to which the trademark laws simply do not apply. Loompanics maintains it used the NFB's marks in a merely descriptive sense to refer to the organization and its services. The NFB disputes this characterization, arguing Loompanics's use of the NFB's marks will result in consumer confusion as to whether "sponsorship, association, affiliation, connection or endorsement" exists between the NFB and the book published by Loompanics. *See* 15 U.S.C. § 1125(a)(1)(A).[6]

In support of this claim, the NFB points to Loompanics's publication of the NFB vendor contract and Location Acquisition Agreement, both including the NFB emblem, in the appendix to the book. Additionally, the NFB points to the following passage in the book as evidence of likely consumer confu-

sion as to sponsorship, association, affiliation, connection, or endorsement.

My charity system is great for the first time biz-op operator. All the necessary charity contracts and locating forms are in this book. All you have to do is photocopy a charity contract and give it to your mooch. As long as the mooch sends in his contract and pays the monthly fees, the charities are happy.

Every charity has a fee for using its name. It averages between $1.50 and $3 a unit per month. Fifty honor boxes at $2 each would cost the mooch $100 a month. Most mooches, when they realize the projected profit sheet is [b---s---] (see marketing pamphlet), only pay once. Then, after weeks of disappointing sales, they take their honor boxes home and eat what's left.

. . . .

Since you have copies of the charity agreements, you will not be dealing with the charity. The only name they will ever receive is that of your mooch.

NFB's Mem. in Opp. at Ex. B (quoting *Biz-op* at 13).

█ Loompanics relies on *New Kids* and *WCVB–TV* in support of its "descriptive use" defense. As noted above, both of these cases involve the defendant's use of the plaintiff's mark to refer to the plaintiff or its services. Neither court, however, established a blanket rule permitting this type of use in all circumstances. In *New Kids,* the court established a three-part test for uses of this type.

[W]here the defendant uses a trademark to describe the plaintiff's product, rather than its own, we hold that a commercial user is entitled to a nominative fair use defense provided he meets the following three requirements: First, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to

---

5. The Ninth Circuit's "nominative fair use" defense is discussed in Part B. *infra.*

6. To some degree, the "fair use" and "absence of confusion" arguments are but two sides of the same coin. Because likelihood of confusion is

the central element of an infringement claim, *see* 15 U.S.C. §§ 1114(1)(a) & (b), 1125(a)(1), a merely referential use which carried with it no likelihood of confusion falls outside of the proscriptions of the trademark laws.

identify the product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.

*New Kids,* 971 F.2d at 308 (footnote omitted). While perhaps novel in its precise formulation, this test is, for the most part, a restatement of two basic principles of trademark law. First, it is well established that the use of a registered mark is not prohibited if the use is intended merely to refer to the holder of the mark. *See Prestonettes, Inc. v. Coty,* 264 U.S. 359, 368, 44 S.Ct. 350, 351, 68 L.Ed. 731 (1924) ("When the mark is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth. It is not taboo."); *August Storck K.G. v. Nabisco, Inc.,* 59 F.3d 616, 618 (7th Cir.1995) (non-confusing use of a rival's mark for purposes of comparison is not only permissible, it is beneficial and encouraged). Second, reference to the holder of a mark by means of the mark itself is permissible provided it is not likely to cause confusion as to origin, approval, or any other prohibited implication in § 1125(a)(1)(A). *See WCVB–TV,* 926 F.2d at 45–46 (television station's use of the term "Boston Marathon" permissible provided there was no real likelihood of confusion as to plaintiff's official sponsorship or imprimatur of the station's broadcast); *Volkswagenwerk Aktiengesellschaft v. Church,* 411 F.2d 350, 352 (9th Cir.1969) (unaffiliated Volkswagen repair shop's use of the terms "Volkswagen" and "VW" permissible provided the use did not suggest an affiliation). These generally accepted principles of trademark law adequately cover the first and third prongs of the *New Kids* test. The second prong, "only so much of the mark or marks may be used as is reasonably necessary to identify the product or service," appears to derive from a concern that confusion as to affiliation may result if the defendant's use of the plaintiff's mark exceeds its legitimate referential purpose. Loompanics's use of the marks "National Federation of the Blind" and "Vending Outreach Program" would survive a challenge under the *New Kids* three-part test. However, Loompanics's use of the NFB's emblem would likely fail the second prong.

In the context of *Biz-op,* Loompanics's reproduction of the NFB's emblem can not be said to represent the minimum use of the NFB's marks necessary to identify the NFB or its services. Because the *New Kids* test is not the law of this Circuit, and because neither the statute nor Fourth Circuit case law portend its adoption, I decline to follow it.

■ The Fourth Circuit has written: "[t]he ultimate question, for purposes of determining liability in [§ 1125(a)] trademark infringement actions, is whether there exists a likelihood that an appreciable number of ordinary prudent purchasers will be misled, or indeed simply confused, as to the source of the goods in question." *Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 127 (4th Cir. 1990) (internal quotation marks and citations omitted). In order to satisfy the "likelihood of confusion" standard of § 1125(a), it is not enough to show that some buyers of the book might *possibly* be confused about the NFB's sponsorship or affiliation with the book. Rather, the NFB must demonstrate that confusion about the NFB's affiliation or sponsorship is *probable. See Blue Bell Bio–Medical v. Cin–Bad, Inc.,* 864 F.2d 1253, 1260 (5th Cir.1989); J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23.01[3][a] (3d ed. 1995) [hereinafter McCarthy] ("likelihood" is equivalent to "probability").

■ Because this matter is before the court on Loompanics's motion for summary judgment, the NFB is entitled to have all of the facts and inferences in the case viewed in the light most favorable to it. However, if the evidence favoring the NFB is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The determination of likelihood of confusion is an "inherently factual" issue. *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.,* 43 F.3d 922, 935 (4th Cir.1995). Because of the fact-intensive nature of this inquiry, summary judgment is the exception. *See Country Floors, Inc. v. Partnership of Gepner and Ford,* 930 F.2d 1056, 1062–63 (3d Cir.1991). However, where an inference of probable consumer

confusion can not reasonably be drawn from the undisputed facts, there is no issue for trial and summary judgment is appropriate. *See Scotch Whisky Ass'n v. Majestic Distilling Co.,* 958 F.2d 594, 598–99 (4th Cir.) (holding summary judgment was appropriate where the plaintiff presented virtually no evidence tending to show consumer confusion related to the defendant's whisky label), *cert. denied,* 506 U.S. 862, 113 S.Ct. 181, 121 L.Ed.2d 126 (1992).

I hold, on the evidence presented, the NFB's claims of likelihood of confusion cannot withstand Loompanics's motion for summary judgment. In order to maintain a cause of action for confusion as to affiliation or endorsement, the NFB must show it is probable an appreciable number of ordinary prudent purchasers of the book will be confused about whether the NFB endorses or approves of the book. In support of its argument, the NFB points to the inclusion in the book of the NFB contracts and the statement that charities "are happy" if the vendors simply send in their monthly fees.

When a referential use of another's mark is made, courts have observed that the context of the use is important in evaluating the likelihood of confusion as to endorsement. For example, in *New Kids,* the Ninth Circuit, in affirming the entry of summary judgment for the defendant newspapers, noted:

> nothing in the announcements suggests joint sponsorship or endorsement by the New Kids. The *USA Today* announcement implies quite the contrary by asking whether the New Kids might be 'a turn off.' *The Star's* poll is more effusive but says nothing that expressly or by fair implication connotes endorsement or joint sponsorship on the part of the New Kids.

*New Kids,* 971 F.2d at 308–309. In *WCVB–TV,* the court affirmed the denial of a preliminary injunction against WCVB holding there was little likelihood of confusion as to the Boston Athletic Association's endorsement of WCVB's broadcast of the Boston Marathon. The court considered factors such as "timing, meaning, context, intent, and surrounding circumstances," and observed, because WCVB's use of the words "Boston Marathon" were descriptive of the event, "[c]ommon sense suggests ... that a viewer who sees those words flash upon the screen will believe simply that [WCVB] will show, or is showing, or has shown, the marathon, not that [WCVB] has some special approval from the BAA to do so." *WCVB–TV,* 926 F.2d at 46.

Similarly, an injunction was denied where a teen magazine used the trademark "Hardy Boys" in an issue devoted to the personalities and habits of the stars of the television show of the same name. In evaluating the likelihood of success on the merits, the court denied the preliminary injunction prayed for, observing there was little likelihood of confusion between the magazine and the television series. The court observed that the term "Hardy Boys" was used descriptively in connection with the actors on the set and not in connection with the plots, and that the defendant's own mark "Teen Beat" was prominently displayed on the cover of the magazine. *See Universal City Studios, Inc. v. Ideal Publishing Corp.,* 195 U.S.P.Q. 761, 762, 1977 WL 25614 (S.D.N.Y.1977).

Where the use of the mark is in an unflattering context or a setting which would be disadvantageous to the mark's holder, it would seem customer confusion as to endorsement or affiliation is particularly unlikely. For example, in *Girl Scouts of the United States of America v. Personality Posters Mfg. Co.,* 304 F.Supp. 1228 (S.D.N.Y.1969), the Girl Scouts organization sought a preliminary injunction to block the printing and distribution of a poster which portrayed "a smiling girl dressed in the well-known green uniform of the Junior Girl Scouts, with her hands clasped above her protruding, clearly pregnant abdomen. The caveat 'BE PREPARED' appears next to her hands." *Id.* at 1230. Several of the plaintiff's marks were reproduced in the poster including "its trademark consisting of the words GIRL SCOUTS with letters G S and trefoil design, its slogan ('BE PREPARED'), and its official uniform." *Id.* at 1231. In denying the injunction, the court concluded "no evidence has been presented, and rational analysis of the situation does not indicate a likelihood the public will believe the Girl Scouts are the authors of the

poster to which they understandably take such violent exception." *Id.*

A similar situation is presented here. It bears repeating that probable consumer confusion as to affiliation or endorsement is an essential element of the NFB's claim for infringement. The only evidence before this court tending to show the existence of that element is the presence of reproductions of the NFB's contracts in the book and the reference in the book's text to charities being happy when they receive their monthly fees. Notably, the NFB is not mentioned by name in that context. Even drawing all reasonable inferences in the NFB's favor, it has not made a sufficient showing as to the existence of the element of probable consumer confusion. Summary judgment will be therefore **GRANTED** on Counts two, six, and ten.

### IV.

#### A.

 As mentioned above, the NFB has raised the theory of contributory infringement in its opposition to Loompanics's dispositive motion. Loompanics opposes this court's consideration of that theory because it is absent from the amended complaint. Because the plaintiff may not amend its complaint in its opposition to a defendant's motion to dismiss, *see Shanahan v. City of Chicago,* 82 F.3d 776, 781 (7th Cir.1996), it must be determined whether the NFB must move to amend its complaint before a claim for contributory infringement may be maintained. *Cf. Elmore v. Corcoran,* 913 F.2d 170, 173 (4th Cir.1990) (district court erred in deciding a case "on an issue that was not pleaded, briefed, argued, or factually substantiated in a purposeful way by the litigants, nor impliedly admitted into the pleadings by consenting defendants").

 Under Federal Rule of Civil Procedure 8(a), a claim must, at a minimum, contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Such a statement is sufficient if it "give[s] the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). The focus of the notice afforded the defendant is on the factual, not the legal, basis of the plaintiff's claim. Notice of the underlying facts is sufficient if the complaint sets forth the circumstances, occurrences, and events which, if proven, would entitle the claimant to the relief sought. *See Gilbane Bldg. Co. v. Federal Reserve Bank of Richmond,* 80 F.3d 895, 900 (4th Cir.1996). In fact, the claimant " 'need not set forth any theory or demand any particular relief for the court will award appropriate relief if the plaintiff is entitled to it on any theory.' " *Id.* (quoting *New Amsterdam Cas. Co. v. Waller,* 323 F.2d 20, 24–25 (4th Cir.1963), *cert. denied,* 376 U.S. 963, 84 S.Ct. 1124, 11 L.Ed.2d 981 (1964)); *see also* Fed.R.Civ.P. 54(c) ("[E]very final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings.").

Where unfair prejudice would result, a claimant is not deemed to be "entitled" to the relief. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 424, 95 S.Ct. 2362, 2374–75, 45 L.Ed.2d 280 (1975). However, Loompanics has not alleged it would be unfairly prejudiced by allowing the NFB to recover on a contributory infringement theory. Furthermore, the NFB has alleged Loompanics has violated 15 U.S.C. § 1114(1). Although this section of the statute does not explicitly provide a cause of action for contributory infringement, courts have often cited it in connection with claims of contributory infringement. *See e.g. Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 853, 102 S.Ct. 2182, 2188, 72 L.Ed.2d 606 (1982) (discussing the disposition by the lower courts); *Getty Petroleum Corp. v. Aris Getty, Inc.,* 55 F.3d 718, 719 (1st Cir.1995). Finally, Loompanics has had an opportunity to respond to the NFB's contributory infringement theory in its reply memorandum. Admittedly, this provides Loompanics with only one opportunity to respond, as opposed to the usual two in pretrial motions practice, but Loompanics did present its arguments on the merits and neither it nor the NFB requested an opportunity for additional briefing. For these reasons, the NFB need not further amend its

complaint to specifically state a claim for contributory infringement. Therefore, I turn now to the merits of the NFB's contributory infringement claim to determine whether it can withstand Loompanics's dispositive motion.

### B.

On the merits, Loompanics argues it is entitled to dismissal of the claim because the NFB has not alleged sufficient facts to sustain the cause of action. It argues the cause of action for contributory infringement may only be maintained if the NFB's marks have been directly or actually infringed. Therefore, because the NFB has not alleged any direct infringement as a result of the book, Loompanics argues the NFB has failed to state an actionable claim.

There is considerable support in the cases, *see, e.g., AT & T Co. v. Winback and Conserve Program, Inc.,* 42 F.3d 1421, 1432 (3d Cir.1994) ("The two elements for contributory infringement are thus summed up as (1) supply of a product, and (2) knowledge of direct infringement.") (internal quotation marks and citation omitted), *cert. denied,* — U.S. ——, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995), and from commentators, *see e.g.,* McCarthy § 25.02; John T. Cross, *Contributory Infringement and Related Theories of Secondary Liability for Trademark Infringement,* 80 Iowa L.Rev. 101, 101 & n. 4 (1994), for Loompanics's position. Because this case presents a unique (or at least unusual) factual situation, these authorities may not provide a complete answer to Loompanics's liability.

The modern cases addressing contributory infringement frequently look to the Supreme Court's decision in *Inwood Labs.* for guidance on the nature and elements of the cause of action. The *Inwood Labs.* Court described contributory infringement as follows:

> [L]iability for trademark infringement can extend beyond those who actually mislabel goods with the mark of another. Even if a manufacturer does not directly control others in the chain distribution, it can be held responsible for their infringing activities under certain circumstances. Thus, if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorily responsible for any harm done as a result of the deceit.

*Inwood Labs.,* 456 U.S. at 853–54, 102 S.Ct. at 2188. In *Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), the Court explained that, under *Inwood Labs.,* a defendant is liable "if it intentionally induced a merchant down the chain of distribution to pass off its product as that of the trademark owner's or if it continued to supply a product which could readily be passed off to a particular merchant whom it knew was mislabeling the product with the trademark owner's mark." *Id.* at 439 n. 19, 104 S.Ct. at 787 n. 19. Loompanics reads this language to preclude liability for contributory infringement where there is no evidence of direct infringement. The *Inwood Labs.* majority stated that both it and Justice White (who authored a concurring opinion) agreed Judge Friendly's opinion earlier in the litigation announced the proper standard. *See id.* at 854 n. 13, 102 S.Ct. at 2188 n. 13; *id.* at 855 n. 15, 102 S.Ct. at 2189 n. 15; *id.* at 859–60, 102 S.Ct. at 2191 (White, J., concurring in the result). Judge Friendly announced the test as follows:

> The authorities later reviewed indicate to us that a manufacturer or wholesaler would be liable under § 32 [15 U.S.C. § 1114] if he suggested, even if only by implication, that a retailer fill a bottle with the generic capsules and apply Ives' mark to the label, or continued to sell capsules containing the generic drug which facilitated this to a druggist whom he knew or had reason to know was engaging in the practices just described.

*Ives Labs., Inc. v. Darby Drug Co., Inc.,* 601 F.2d 631, 636 (2d Cir.1979). In the *Inwood Labs.* case, there was no dispute direct infringement had occurred. *See e.g., Inwood Labs.,* 456 U.S. at 852–53, 102 S.Ct. at 2188 (discussing the district court's review of actual incidents of mislabeling). Although the first prong of the Supreme Court's formula-

tion of the test requires that the defendant "intentionally *induces* another to infringe," the formulation by Judge Friendly requires only a "suggestion, even if only by implication that" infringement occur. Significantly, both the Supreme Court and Judge Friendly cite Judge Wyzanski's opinion in *Coca–Cola Co. v. Snow Crest Beverages, Inc.*, 64 F.Supp. 980 (D.Mass.1946), *aff'd*, 162 F.2d 280 (1st Cir.), *cert. denied*, 332 U.S. 809, 68 S.Ct. 110, 92 L.Ed. 386 (1947). That court set forth the following common-law principles:

> It is, of course, defendant's duty to avoid intentionally inducing [third parties] to market defendant's products as products of plaintiff. It is also defendant's duty to avoid knowingly aiding [third parties] which purchase defendant's products from marketing those products in such a manner as to infringe plaintiff's trademark.

*Id.* at 989 (citing, *inter alia*, Restatement of Torts §§ 713, 738 (1938). The Restatement provisions cited by the *Coca–Cola* court provide, in full: "One fraudulently markets his goods as those of another if, though making no misrepresentation himself, he intentionally induces his purchasers so to market them." Restatement of Torts § 713 (Inducing Fraudulent Marketing); "One who induces or aids persons who purchase goods directly or indirectly from him to market them in such a manner as to infringe another's trade-mark or trade name infringes it himself." Restatement of Torts § 738 (Inducing or Aiding One's Purchasers to Infringe on Resale). The current version of these Restatement provisions can be found in the Restatement (Third) of Unfair Competition §§ 8, 27 (1993). Consistent with Loompanics's position, the provisions of the 1938 Restatement of Torts now set forth in the Restatement of Unfair Competition, appear to contemplate some direct infringement as a condition of contributory infringement liability. Section eight of the Restatement of Unfair Competition provides, in full:

> One who markets goods or services to a third person who further markets the goods or services in a manner that subjects the third person to liability to another for deceptive marketing under the rules stated in §§ 2–6 is subject to liability to that

other for contributory deceptive marketing if:

> (a) the actor intentionally induces the third person to engage in such conduct; or
>
> (b) the actor fails to take reasonable precautions against the occurrence of the third person's conduct in circumstances in which that conduct can be reasonably anticipated.

Restatement of Unfair Competition § 8. The provision of the Restatement addressing contributory infringement is essentially identical to § 8 except that it refers specifically to infringement instead of "deceptive marketing" or simple "conduct." *See* Restatement of Unfair Competition § 27.

Most contributory infringement cases, such as *Inwood Labs.*, have arisen in the manufacturer/distributor context. *See Polo Ralph Lauren Corp. v. Chinatown Gift Shop.*, 855 F.Supp. 648, 650 (S.D.N.Y.1994). The theory of liability is not confined to this category of cases, however. For example, in *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143 (7th Cir. 1992), the court looked to principles of common-law tort liability and *Inwood Labs.* in holding the owner of a flea market could be secondarily liable for a vendor's violations of the Lanham Act if it knew or had reason to know of the violations. *See id.* at 1148–49.

■ As noted above, the touchstone for liability under the Lanham Act is a showing the defendant is liable for a "likelihood of confusion" in connection with the use of the plaintiff's mark. *See* 15 U.S.C. §§ 1114(1)(a) & (b) (the use of a mark violates the Act if it is "likely to cause confusion, or to cause mistake, or to deceive"), 1125(a)(1) (a false designation of origin violates the Act if it is "likely to cause confusion, or to cause mistake or to deceive"). The plaintiff need not show evidence of actual confusion. *Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 463 (4th Cir.1996); *see also* McCarthy § 23.02[1]. Moreover, a plaintiff " 'does not have to await the consummation of threatened injury to obtain preventative relief.' " *Id.* (quoting *Standard Oil Co. of N.M. v. Standard Oil Co. of Cal.*, 56 F.2d 973 (10th Cir.1932). The provision of the Lanham Act authorizing in-

junctive relief allows a court "to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, *to prevent the violation of any right of the registrant of a mark.*" 15 U.S.C. § 1116. Accordingly, [i]njunctive relief may be obtained even before defendant actually opens for business, if the threatened act of defendant is imminent and impending. McCarthy § 30.05.

In light of these principles, the unusual factual circumstances of this case, and the stage of the litigation, this court is unwilling to hold, as a matter of law, the NFB is unable to obtain any relief, particularly equitable relief, simply because the NFB has not yet presented any evidence of direct infringement. Loompanics's motion to dismiss the NFB's claims for contributory infringement is therefore DENIED without prejudice to renewal at the summary judgment stage.

## V.

■ Loompanics argues it is entitled to dismissal of Counts one through four and nine through twelve because the NFB's registered marks "National Federation of the Blind" and "Vending Outreach Program" are generic. Generic terms are never entitled to trademark protection, and consequently, any infringement action based on a generic mark must be dismissed. *See Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985).

■ Courts classify trademarks into a series of categories based on degrees of distinctiveness. Marks classified as "fanciful," "arbitrary," and "suggestive" are inherently distinctive, and, accordingly, are afforded the greatest protection. Marks that are descriptive, and therefore not inherently distinctive, "merely describe a function, use, characteristic, size, or intended purpose of the product. Examples of such 'descriptive' marks include After Tan post-tanning lotion, 5 Minute glue, King Size men's clothing, and the Yellow Pages telephone directory." *Sara Lee,* 81 F.3d at 464 (citation omitted). Descriptive marks "describe[ ] the qualities or characteristics of a good or service, and this type of mark may be registered only if the registrant shows it has acquired secondary meaning,

*i.e.,* it has become distinctive of the applicant's goods in commerce." *Park 'N Fly,* 469 U.S. at 194, 105 S.Ct. at 661 (internal quotation marks and citation omitted). A generic mark "refers to the genus of which the particular product is a species." *Id.* A generic term is never protectable as a trademark, even where the mark has been registered and has become "incontestable." *See* 15 U.S.C. § 1065(4); *Park 'N Fly,* 469 U.S. at 197, 105 S.Ct. at 663 (reviewing the legislative history); *see also* 15 U.S.C. § 1064(3) (permitting the filing of a petition for cancellation of a mark which has "become[ ] the generic name for the goods or services … for which it is registered"). A mark becomes "incontestable" (with certain exceptions and subject to other conditions) if it has been in continuous use for five years after the date it was registered. *See* 15 U.S.C. § 1065; *see also* 15 U.S.C. § 1115(b) (with some exceptions, the registration of an incontestable mark provides "conclusive evidence of the validity of the registered mark … and of the registrant's exclusive right to use the mark.").

■ As noted above, the NFB's mark "National Federation of the Blind" was registered on January 10, 1978, and its mark "Vending Outreach Program" was registered on July 7, 1992. As it has been registered for more than five years, the NFB alleges in its complaint the mark "National Federation of the Blind" is incontestable. However, before a mark can be deemed incontestable, the registrant must file an affidavit which attests to the fulfilment of the requirements for incontestability "with the Commissioner [of Patents and Trademarks] within one year after the expiration of any such five-year period." *Id.* § 1065(3). There is no evidence in the record a § 1065(3) affidavit was ever filed with the Commissioner. Additionally, the NFB does not make any argument about the incontestable status of its mark in its opposition to Loompanics's motion. Ultimately, however, whether the "National Federation of the Blind" mark meets the criteria for incontestable status is irrelevant because Loompanics has alleged the defense of genericness. Proof a mark is generic will render unprotectable a mark that otherwise

meets the requirements of incontestability. In fact, it is likely that, if proven generic, the mark never obtained incontestable status. *See* 15 U.S.C. § 1065(4) ("[N]o incontestable right shall be acquired in a mark which is ... generic...."); *Texas Pig Stands, Inc. v. Hard Rock Cafe Intern., Inc.*, 951 F.2d 684, 689 n. 5 (5th Cir.1992) ("[I]f it is determined that the mark is generic, it can never become incontestable."); *Urantia Found. v. Maaherra*, 895 F.Supp. 1338, 1342 (D.Ariz.1995).

■■■■■ The United States Patent and Trademark Office (PTO) will not register a mark which it determines is generic. The PTO requires at least that the mark be descriptive, and, if so, that the applicant prove that the mark has secondary meaning. *See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 934 (4th Cir.1995). Therefore, a registered mark is presumed to be valid, *see Glover v. Ampak, Inc.*, 74 F.3d 57, 59 (4th Cir.1996), and (on the continuum of strong to weak marks) at least a descriptive mark with secondary meaning. *See Lone Star*, 43 F.3d at 934. A fortiori, implicit in this presumption is also the presumption the mark is not generic. *See Coca–Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1254 (9th Cir.1982). In an infringement action, this presumption shifts the burden of proof from the plaintiff (who at common law would have to prove a right to exclusive use) to the defendant who must prove, by a preponderance of the evidence, that the plaintiff is not entitled to exclusive use because the mark is generic or at least descriptive and without secondary meaning. *See Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1529 & n. 4 (4th Cir.1984).[7] The question whether the mark is generic is ultimately one of fact, *see Convenient Food Mart, Inc. v. 6–Twelve Convenient Mart, Inc.*, 690

F.Supp. 1457, 1460 (D.Md.1988), *aff'd without op.*, 870 F.2d 654 (4th Cir.1989), which may be proven by "evidence [which] may come from purchaser testimony, consumer surveys, listings and dictionaries, trade journals, newspapers, and other publications." *Glover*, 74 F.3d at 59. The party seeking to prove a mark is generic must show, in the minds of a majority of the usual customers or other relevant members of the public, *see* McCarthy § 12.02[1], the term must primarily signify the product, not the producer. *See id.* § 12.02[3](a) (citing *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938)). Given this contextualized inquiry, to prove a mark is generic, a party must

> (1) identify the class of product or service to which use of the mark is relevant; (2) identify the relevant purchasing public of the class of product or service; and (3) prove that the primary significance of the mark to the relevant public is to identify the class of product or service to which the mark relates.

*Glover*, 74 F.3d at 59.

■■■ In support of its argument that the marks "National Federation of the Blind" and "Vending Outreach Program" are generic, Loompanics cites dictionary definitions of the words used and makes analogies to several cases. Loompanics cites no testimony in the form of affidavits, depositions, or otherwise; no surveys; and no trade journals or other publications. *Cf. id.* Furthermore, Loompanics does not even attempt to either identify the relevant group of consumers of the NFB's services, or demonstrate that the majority of the members of this class would primarily identify the NFB's marks with the class of services of which the NFB and the Vending Outreach Program are a part, as

---

7. Loompanics argues the effect of the NFB's registration is only to shift to it the burden of production, not persuasion. For this proposition, Loompanics cites the same paragraph of the same opinion the NFB cites for the proposition that Loompanics may only overcome the presumption of non-genericness by producing a preponderance of the evidence. *See Convenient Food Mart, Inc. v. 6–Twelve Convenient Mart, Inc.*, 690 F.Supp. 1457, 1460 (D.Md.1988), *aff'd without op.*, 870 F.2d 654 (4th Cir.1989). The

*Convenient Food Mart* court cited *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 938 (7th Cir.1986), for the "burden of production" language. Because *Liquid Controls* appears to be the minority view (if not a view exclusively held by the Seventh Circuit), *see* McCarthy § 12.02[7][a], and because the Fourth Circuit has adhered to the *Pizzeria Uno* formulation, *see Glover*, 74 F.3d at 59, this court will disregard any portion of *Convenient Food Mart* not in accord with the formulation in *Pizzeria Uno*.

opposed to the NFB and their Vending Outreach Program specifically.

Loompanics's argument employing dictionary definitions of the components of the composite term "National Federation of the Blind" is, at best, weakly probative of the ultimate fact it must prove. As an initial matter, dictionary definitions, while useful in some contexts,[8] "can not be conclusive of genericness." *See* McCarthy § 12.02[7][b]. This is particularly true where, as here, the challenged mark is a five word composite mark made up of ordinary terms. *See Door Systems, Inc. v. Pro–Line Door Systems, Inc.*, 83 F.3d 169, 171 (7th Cir.1996) (in assessing genericness, presence of component words of a multi-word mark in the dictionary, by itself, "cannot count for much"). The simple reason for this is that a mark must be analyzed for genericness as a whole. A mark may be a protectable whole greater than the sum of its generic parts. *See Self–Realization Fellowship Church v. Ananda Church of Self–Realization*, 59 F.3d 902, 912–13 (9th Cir.1995) ("A court may not review the validity of a composite-term trademark by 'dissecting' the term and reviewing the validity of its component parts individually."); *Blinded Veterans Ass'n v. Blinded American Veterans Found.*, 872 F.2d 1035, 1041 (D.C.Cir. 1989); *Berner Intern. Corp. v. Mars Sales Co.*, 987 F.2d 975, 981 (3d Cir.1993); *American Angus Ass'n v. Sysco Corp.*, 829 F.Supp. 807, 825–26 (W.D.N.C.1992) (employing rule and observing that the Fourth Circuit has used a similar approach). *But see National Conference of Bar Examiners v. Multistate Legal Studies, Inc.*, 692 F.2d 478, 488 (7th Cir.1982) ("[I]f the components of a trade name are common descriptive [generic] terms, a combination of such terms retains that quality."), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983). Therefore, the presence in a dictionary of the component words comprising the NFB's marks is simply not probative of the genericness of the mark as a whole. *See, e.g., Texas Pig Stands*, 951 F.2d at 692–93 (challenger of mark not entitled to a directed verdict on question whether "pig sandwich" is an unprotectable generic mark).

Loompanics also argues the NFB's marks are generic because they accurately and succinctly describe their associated services; "National Federation of the Blind" describes a nationwide federation of blind persons, and "Vending Outreach Program" describes an outreach program which employs vending machines. While this is true, the NFB's marks are valid and protectable if they are at least descriptive with secondary meaning.[9] A mark is descriptive if it "describe[s] a function, use, characteristic, size, or intended purpose" of the service. *Sara Lee*, 81 F.3d at 464. Secondary meaning provides an otherwise unprotectable descriptive mark with "acquired distinctiveness." *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992) (a descriptive mark has acquired secondary meaning if it "has become distinctive of the applicant's goods in commerce") (quoting 15 U.S.C. § 1052(e), (f)); *Sara Lee*, 81 F.3d at 464 (a mark has secondary meaning if, " 'in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself.' ") (citation omitted). It must be remembered, the "public" involved in this inquiry is not the public at large, it is the "relevant public." *See Self–Realization Fellowship Church*, 59 F.3d at 909 (the genericness of "Self–Realization" is determined by reference to the understanding of consumers of Hindu–Yoga products). In a case more directly analogous to the one at bar, one court stated the issue this way: "The question is whether the relevant class of contributors associates the

---

**8.** Dictionary definitions are particularly helpful where a composite mark which was "invented" by its holder is listed in the dictionary as the accepted designator for a unique product. *See, e.g., Murphy Door Bed Co. v. Interior Sleep Systems, Inc.*, 874 F.2d 95, 101 (2d Cir.1989).

**9.** Along these lines, the Seventh Circuit has noted:

It is true that a descriptive term often, perhaps generally, can be used to denote the product, and thus to have a generic use. But that in itself, its capability of *becoming* generic, does not make it a generic term.
*Door Systems*, 83 F.3d at 172.

American Diabetes Association with the charitable services it performs." *American Diabetes Ass'n, Inc. v. National Diabetes Ass'n*, 533 F.Supp. 16, 19 (E.D.Pa.1981), *aff'd without op.*, 681 F.2d 804 (3d Cir.1982). Because the focus of the inquiry in determining secondary meaning is on the understanding of the relevant public, the efforts of the mark holder in establishing the mark are of secondary importance. While courts do consider "1) the length and manner of its use, 2) the nature and extent of advertising and promotion, and 3) other efforts at creating a conscious connection in the public's mind between the designation and the service," *id.*, it is the *effectiveness* of those efforts in establishing in the minds of the relevant public the connection between the mark and its holder that is the ultimate focus of the inquiry. *See King–Size, Inc. v. Frank's King Size Clothes, Inc.*, 547 F.Supp. 1138, 1157 (S.D.Tex.1982). For this reason, "direct consumer evidence, *e.g.*, consumer surveys and testimony is preferable to indirect forms of evidence" such as dictionaries, trade journals, and other publications. *Berner Intern.*, 987 F.2d at 982.[10]

Loompanics relies heavily on the *Blinded Veterans Ass'n* case in arguing the mark "National Federation of the Blind" is generic. In *Blinded Veterans*, the Blinded Veterans Association (BVA) sought, *inter alia*, to enjoin the Blinded American Veterans Foundation (BAVF) from using the words "blinded" and "veterans" in its name. The district court found the names of the two organizations were confusingly similar and "enjoined the BAVF from using the name 'Blinded American Veterans Foundation,' the initials 'BAV' or 'BAVF,' and 'any name in which the words "veterans," and "blind" or "blinded," are employed as noun and modifying adjective.'" *Blinded Veterans Ass'n*, 872 F.2d at 1036. Then Judge Ginsburg, writing for the D.C. Circuit reversed, writing "[w]e hold that BVA's name is not a protectable trademark because the term 'blinded veterans' is generic." *Id.* It is doubtful, however, the court actually held the BVA's mark, "Blinded Veterans Association," was not protectable as a

trademark. First, such a holding is unnecessarily broad in light of the relief sought by the plaintiff which was to enjoin the use of the terms "blinded" and "veterans" in the name of the BAVF. Second, the court, in another part of its opinion, wrote "[w]e hold that *the term* "blinded veterans" is generic and therefore not entitled to trademark protection." *Id.* at 1039 (emphasis supplied). The court also wrote "[t]he threshold issue for this court is whether '*blinded veterans*' is generic, and therefore unprotectable as a trademark." *Id.* at 1040 (emphasis supplied); *see also id.* at 1041 ("we are convinced ... that the combination of 'blinded' and 'veterans' in this case remains generic"); *id.* (" 'blinded veterans' is generic when used to refer to once-sighted persons who served in the armed forces"); *id.* at 1041–42 ("the district court lacked justification for declaring 'blinded veterans' descriptive rather than generic"). The issue in this case is not whether isolated portions of the NFB's marks are generic, but whether the marks as a whole are entitled to protection. Furthermore, *Blinded Veterans Ass'n* is distinguishable because the BVA had the burden of proving the term "blinded veterans" was not generic because the term was not registered with the PTO. *See id.* at 1041. As noted above, all of the marks the NFB seeks to protect are registered, therefore the burden is on Loompanics to prove, by a preponderance of the evidence, the marks are not entitled to protection.

In short, Loompanics has failed to meet its burden. It has not demonstrated the NFB's marks are generic as a matter of law. Unlike a term such as "chocolate fudge soda" which "necessarily describes a genus of products," and "which has no functional equivalents which could describe the genus at issue" *see Berner Intern.*, 987 F.2d at 981 n. 5, there is a genuine issue of fact whether the NFB's marks are descriptive. A finding that the NFB's marks are protectable would not impose "excessive costs of information on competitors and consumers" by requiring

---

**10.** The *Berner Intern.* court noted:

'Consumer surveys have become almost de rigueur in litigation over genericness. Judges are now used to survey evidence and often

expect to receive evidentiary assistance by surveys in resolving generic disputes.'
*Berner Intern.*, 987 F.2d at 982–83 (quoting McCarthy § 12:02[8] (footnotes omitted)).

**1250**

"elaborate and possibly confusing paraphrase" to refer to their organizations and services. *See Door Systems,* 83 F.3d at 171. In other words, other organizations and consumers would not be "rendered speechless" in referring to their services if prohibited from using the NFB's marks. *See id.* Similarly, Loompanics has not come forth with any probative evidence that the NFB's marks are devoid of secondary meaning let alone enough evidence to prove no genuine issue of fact exists regarding whether the marks have secondary meaning in the minds of the relevant public. Therefore, Loompanics's motion to dismiss and for summary judgment on the issue of genericness is DENIED.

## VI.

 Loompanics has moved to dismiss the NFB's claims for tarnishment of its trademarks. In neither its complaint nor any subsequent paper submitted to this court has the NFB alleged which jurisdiction's law governs its tarnishment claims. The NFB does not argue the Lanham Act or Maryland law provides the rule of decision for its tarnishment counts. It argues simply that it would be premature at this stage of the litigation for this court to rule on Loompanics's motion to dismiss because it has not yet determined in which State the NFB's marks have been most tarnished. A general allegation of a claim of tarnishment under the law of some as yet undetermined jurisdiction does not provide Loompanics with fair notice of the claim. *See Smith v. St. Bernards Regional Medical Center,* 19 F.3d 1254, 1255 (8th Cir.1994) ("Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim' that gives fair notice of the plaintiff's claim and grounds for relief."). Requiring Loompanics to guess as to the elements of the State law against which it must defend itself can hardly be considered "fair notice." Furthermore, because it is impossible to determine whether the NFB has alleged facts sufficient to make out a prima facie claim of tarnishment without knowing what facts would be required under applicable law, Loompanics's motion to dis-

miss Counts three, seven, and eleven will be **GRANTED.**

A separate order follows.

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby **ORDERED** that:

1. the defendant's motion to dismiss Counts three, seven, and eleven is **GRANTED;**

2. the defendant's motion for summary judgment as to Counts two, six, and ten is **GRANTED;**

3. the defendant's motion to dismiss, or, in the alternative for summary judgment is otherwise **DENIED.**